Good morning, Your Honors. I'm James Pleasence, representing the Respondent Bornakovs. Mr. Bornakov has been persecuted primarily for his membership and beliefs as a Pentecostal and secondarily because he's a member of an Asian native minority, the Hakkas. Because the issues turn so closely on their individual facts, I'd like to take a few minutes to review the incidents of persecution in Mr. Bornakov's case, as testified by Mr. Bornakov, who was found by the IJ to be credible. The Pentecostal church in his town was burned down. Attempts to preach in public were broken up by the police. He had great difficulties in finding work. When he found a job as a night watchman at a municipal market, he and his fellow Pentecostal were subject to repeated ridicule of their religion that escalated into repeated physical attacks. His friend at work was beaten in front of a supervisor who did nothing but laugh. What's the evidence in the record that those encounters with the supervisor had anything to do with his religion? Well, the testimony was that in the context of after hour parties, the supervisor would try to get them to engage in drinking and fooling around with prostitutes. And they wouldn't do it. And they would place bets on whether they would do it. And then this escalated into a violent incident. And they wouldn't do it because of their religion, which was mocked by the supervisor. What about the claim that this was done because of theft? Mr. Mr. Bornakov testified credibly that he wasn't even on watch during one of the thefts. And therefore, it was nothing but a pretext. And, you know, when the incident occurred and the supervisor had his hands around Mr. Bornakov's throat and was telling him to pray to God, it's not a stretch, I think, to say that that might have been religiously motivated. And you also have to take it in the context of months and months of religious slurs, religious epithets being hurled against him and his family. And I think that's the kind of thing that's likely to happen in Russia. And the fact is, I think that the reason that Mr. Bornakov testified, they were the only ones that were treated in that fashion. As I recall, he made several trips back to Russia after he'd gone to the United States. He came back three times, and he preached and pursued his religion. Then he went back to United States. Is that consistent with the claim of persecution? It's consistent with a man with strong religious beliefs. I understand it's consistent with your claim that he fears future persecution. I think it is, because he did testify that he kept a very low profile when he went back. When he went back, he didn't have to work. He was only there for relatively short periods of three to five months. And during that time, he would proselytize in his home and other people's homes. He kept a very low profile, didn't go out in public. And in that respect, he was able to avoid persecution. But if he had to go back, he'd have to get a job. And he'd either have to hide his religion, which I don't think our case law requires him to do, or he'd have to deal with the type of persecution on the job and in the public that he experienced. Is there in the record the country report for the time at which he was claiming the persecution? Yes. Subsequently? There is some substantial country condition materials from Yuri Shvets, an expert in the area. Mr. Shvets was able to document one of the incidents that my client testified to where one of his pastors went and tried to start a Pentecostal church in a city 60 miles away and was denied registration, was not able to lease a place. And when he tried to preach in a public area, he was arrested, and he and his son were beaten by the police. I was thinking about a State Department official country report. Is that in the record? I believe it is. I believe that it was indicated that there's widespread hostility to Pentecostals. But many of the Pentecostal churches have been able to register, and that is true. Not all of them, as indicated by that incident I just talked about. But he was registered, his church was registered. His church in his town was registered by affiliating with another registered church. They had difficulty getting it on their own, but they were able to affiliate and register. Did he ever report any of these incidents to the local police or local authorities? No, he didn't. But he testified again credibly that the reason that he didn't was because he had seen what happened to other members of his church who reported things, and police did nothing, and then the persecution got worse. And bear in mind, he was working as a municipal employee. He was working for municipal watchmen, and his supervisors who saw these incidents did nothing. In fact, in some cases, they were the perpetrators. There was no chain of command that he felt he could go to based on his experiences and the experiences of his fellow church members that indicated that going to the police would do any good. Is there anything in the country reports that shows that the authorities don't take steps to protect religious? I believe there was in the testimony of Yuri Shvets that the fact he testified that But he was your expert, right? He was the expert. Retained by you. Yes. He testified that the – in many cases, this kind of behavior is encouraged by the government. That the idea that – is that this is a foreign sect somehow is threatening to Russia because it's foreign and not the more favored religion of Russian orthodoxy, which does have a favored place in Russian law, and that was – that's granted by both the State Department and our expert. So what are you asking for us to do? What is it that you want? I am requesting that the court find that there was persecution. I think that this – the incidents as described, there are multiple incidents of physical violence. There's an economic hardship that was placed on him. He was unable to find work. Lost this job. He stayed at this job longer than anybody would have if they could have found other work. So your view is that there's – the evidence in the record compels a finding of past persecution, and then where do we go? Then, that being the case, then, there would be a presumption in favor of well-founded fear. The court wished they could remand for a determination of whether the government can rebut that presumption in some way. The BIA – neither the BIA nor the IJ addressed that. Is that correct? Right. That was not – I think there was one reference in the BIA that said, well, the country conditions, as indicated, were when this was the Soviet Union, and now it's Russia. But there was substantial evidence that really didn't – there was a difference, yes, but not a difference that made him – allowed him to be less fearful because the problems in Russia were equal or greater than in the previous Soviet Union. So that – but that wasn't really addressed because the court never got to the evidence in this case, bearing in mind that, you know, Mr. Kornikoff was considered to be credible, was – was sufficient, and not only sufficient, but compelling to find that persecution occurred, particularly in the area of religious motivation, you know, where he really only has – under the law, he only has to show that it was a partial motivation. And given the fact that, you know, the – his – he and his co-pentecostal worker were treated in this way differently than others, the taunts and religious persecution was open, it's – it's surprising that the BIA and – and the IJ found not even sufficient evidence of mixed motive. Would you like to save the balance of your time for – I will save the balance of my time. Thank you. May it please the Court, my name is Tom Woods, and I represent the Respondent. In this case, the sequence of events that unfolds after October 1994, until Mr. Bernikoff finally applies for asylum in July 2003, are particularly significant, and they demonstrate that a reasonable fact-finder can conclude that the events occurred during the short stint that he was a night watchman, from the end of 1992 until October of 1994. When he leaves that job, he doesn't come to the United States. He doesn't do that until 1996. And during that period of time, there are  no suggestions that he's being targeted, no suggestion that he's being threatened. Does he have a regular job after he left the night watchman job? He testifies that he worked as a – I believe doing remodeling was his testimony below. Right. And then when we get to 1996, it's not that Mr. Bernikoff is fleeing to the United States. What he testifies is that he takes advantage of the opportunity to attend a religious school in Ohio. And then once here in the United States, he travels back to Russia. And the testimony here, Mr. Bernikoff did not give consistent testimony as to the times and dates he comes back to Russia, but it appears that at a minimum, he travels back on three occasions for periods of about three to six months. And again, during those periods, there's no evidence that he's subject to any violence, that he's targeted, that he's threatened. And there's no example – evidence, for example, that the individuals who had targeted him when he was at his job in the night watchman have any interest in him whatsoever. And in light of that sequence of events, I think Judge Canby's decision in the Hoekse case, which is at 319 F. 3rd, 1179, is particularly significant here. In that case, you had an ethnic Albanian who was living in Kosovo. And as we all know, that was a time when Serbia was really trying to exert its stranglehold over Kosovo. And the applicant testified that he was subject to threats, including death threats, and that a mob of Serbs descended upon him, beat him, suffered broken ribs, I believe extensive abrasions on his face. But then he stayed in Kosovo for a period of six months. And during that six-month period, there was no evidence, for example, that he was subject to any other incidents of violence, and in particular, no evidence that anybody from that mob that had attacked him had any continuing interest in him at all. And Judge Canby found that very significant. And what he said is that when you look at that, a reasonable fact finder would conclude that that was an isolated instance of violence, and not something that was broader and ongoing. And we submit that Hoekse case is very instructive. What's in the record in the way of country reports? The State Department report is at the record, Your Honor. It's at 315. And what does it report about the treatment of the Pentecostals? There are isolated the report talks about a variety of incidents, and there are incidents in which that involve religious minorities in Russia. But I think what the one of the focus of not only the report, but Mr. Bernalco's expert, is the effect of registration in Russia. So in 1997, Russia passed this law that basically said that religious organizations need to register. And in the absence of registration, the religious organization is not deemed to be, have any legal capacity and, in fact, can be, I believe, sadly, the term used is liquidated. I know. But in this case, as I think we saw, the church was registered. And I also think it's significant to look at two of the Court's cases, the, you know, Nalguko case, which is at 333 F. 3rd. 1012, and the Halim decision, which is at 358 F. 3rd. 1128. And those deal with claims of Pentecostals who are living in the Ukraine. And Judge Gould's decision in Nalguko is particularly, I think, instructive. In that case, you had a kindergarten teacher who was fired because of her religious beliefs. And she testifies that she was subject to constant threats, physical violence, even death threats, and that police, for example, barged into a private home during prayer service, broke up the prayer service, knocked her down. And what Judge Gould concluded is that a reasonable pathfinder could conclude that those incidents, even when taken in totality, did not amount to persecution. And in this case, Mr. Bernikoff testifies that he, when he was going back to Russia, he was still acting as a minister, still preaching his faith, that he still attended prayer services. And we submit that the Halim case and the Nalguko case are very instructive on that point. Do you challenge that he was, suffered past persecution? We do, Your Honor. And the two incidents, for example, perhaps we can talk about those where he was a night watchman. I think there are two things to say about those. The first is, the incidents, a reasonable pathfinder could conclude that they were simply too minor to constitute a rife. Well, when someone strangles you and you pass out, I don't think that's too minor. Your Honor, what I would refer to is the Hoxha decision, where in that case, a mob descends upon the applicant. Well, they didn't in Hoxha. It wasn't that he wasn't beaten up. It was just a question of who did it and how long he stayed afterwards and did he remain fearful. But I'm just talking about the incident itself. It would seem that it's not minor when you're choked. What I would say is, it's certainly a violent incident. No question about that. But in order to constitute persecution, of course, it needs to be either the government, which was not the case here, or a group that the government cannot control. This is government in a sense. It was the municipality. I believe it was the municipal market. Whether he was a municipal employee or a government employee, I'm not going to make a representation one way or the other. My understanding of the record was that he was, but... But what I would say is that with the passage of time demonstrated is that that was an isolated... Well, that's just a different issue. I just wondered if you challenged that those particular incidents couldn't constitute persecution. Well, the other, as the I.J. found, is the motivation for the incidents. Okay. So here the applicant testified credibly. And certainly his version of events is deemed to be true. But his belief and conclusions as to actually what was in the minds of the individuals who undertook those... Well, but when you put together the fact of their taunting and their really going after him because of his religion and then falsely accusing him, sounds like you've at least got a mixed motive there. And what I, Your Honor, with respect, what I would say is, given the standard of review, this arose in a particular context. And the context was he was charged with stealing or not preventing a theft that occurred at the market. And what Mr. Bernkopf says is, I wasn't involved. In fact, I wasn't even on duty at that time. But that, of course, is not conclusive as to what the individual actually knew, whether he was on duty, he could have believed that. And that's something that a reasonable factfinder, we would submit, could conclude that the motivation was lacking. I see my time has about to expire. If there are no further questions. I don't believe so. Thank you. Your Honors, several of the cases cited by the government's attorney are distinguishable in that they were isolated incidents, single isolated incidents. That was true in Hoksha. It was also true in Nagoko. In Nagoko, the respondent was never physically harmed. By contrast, Mr. Bernkopf testified that there were at least five incidents in which he was physically attacked. This went on over a long period of time. Well, of those five incidents, how many of them involved representatives of the government or circumstances where the government did not protect them? Well, I would submit that the ones at work. Those two. There were actually five at work. Five at work. And there were two that were out on the street he was preaching, like at bus stops or something. Those, you know, he testified briefly to those. But there were five incidents, he said, at work. And they were situations where the supervisors clearly had no interest in doing anything about what was going on. In fact, they encouraged it. And he saw this happen to his friend, who eventually had to quit. He stuck out a little bit longer, suffered more incidents, and eventually quit. He did work as a self-employed remodeler, but he did testify, too, that he couldn't earn enough in that capacity to sustain his family, and was not able to get another job after having lost the one that he had. So the evidence in the record of persecution, these are serious incidents. These are not just minor scuffles that came and went. When a person, you know, has passed out, is being told, you better pray to God he doesn't die, I think anybody would take that very seriously. That was certainly the most serious incident. But the others were serious as well, and there were threats and other things involved. Thank you. Thank you.
judges: Fletcher, Paez, Schwarzer